UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
ROCKAWAY BEVERAGE, INC. and
MARIO A. TAPIAS,

                Plaintiffs,                  **MEMORANDUM & ORDER**
                                           18-CV-579 (PKC) (SJB)

       - against -

WELLS FARGO & COMPANY, WELLS
FARGO MERCHANT SERVICES, LLC,
WELLS FARGO BANK, N.A., FIRST DATA
MERCHANT SERVICES LLC f/k/a FIRST
DATA MERCHANT SERVICES
CORPORATION, ABC INC., XYZ CORP.,
JANE DOE, and JOHN DOE,

                Defendants.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

      Plaintiffs Rockaway Beverage, Inc. ("Rockaway") and Mario A. Tapias ("Tapias")

(collectively, "Plaintiffs") brought this action against Defendants Wells Fargo & Company

("WFC"), Wells Fargo Merchant Services, LLC ("WFMS"), Wells Fargo Bank, N.A. ("WFB"),

First Data Merchant Services, LLC f/k/a First Data Merchant Services Corporation ("First Data")

(collectively, "Defendants"), and certain unknown business entities and individuals, alleging

breach of contract, fraud, and negligence in connection with an agreement to provide credit card

processing services to Rockaway for use in its beverage sales business. Before the Court is

Defendants' motion to dismiss Plaintiffs' Second Amended Complaint for failure to state a claim.

For the reasons that follow, Defendants' motion is granted in part and denied in part.

**BACKGROUND**

I.     **Factual Allegations**

      Plaintiff Tapias serves as the President and CEO of Plaintiff Rockaway, a retail and

wholesale provider of beverages opened in August 2014. (Second Amended Complaint ("SAC"),

Dkt. 28, ¶ 16–17.)[1]  During a November 2014 visit to another beverage distributor in Yonkers, New York, Plaintiff Tapias met an individual named Lewis Maresca ("Maresca").  (*Id.* ¶ 18.)  At this meeting, Maresca told Tapias that he worked as an agent for "First Data" and "Wells Fargo," businesses that offered credit card processing services.  (*Id.* ¶¶ 19–20.)  Tapias advised Maresca that he had recently opened Rockaway and was interested in obtaining credit card processing services to facilitate the business's retail sales.  (*Id.* ¶ 24.)

Subsequently, Tapias and Maresca met a second time at Rockaway's place of business in Jamaica, New York on December 12, 2014.  (*Id.* ¶ 25.)  At this second meeting, Plaintiffs allege that Maresca, acting on Defendants' behalf, entered into an implicit (unwritten) agreement ("the Implied Agreement") between Rockaway and Defendants.  (*Id.* ¶ 26.)  Under the Implied Agreement, Defendants agreed to provide credit card processing services in exchange for a portion of the revenue generated by Plaintiff Rockaway through credit card sales.  (*Id.*)  In addition to the Implied Agreement, Plaintiffs allege that at the December 12, 2014 meeting, Tapias also signed a written agreement ("the Written Agreement"), on Rockaway's behalf, relating to "the use and/or provision of credit card processing equipment and/or software."  (*Id.* ¶ 29.)  Plaintiffs have not produced the Written Agreement, as they never received a copy, nor can they recall its terms.  (*Id.* ¶¶ 29–30.)  According to Plaintiffs, the Written Agreement was never signed by any Defendant. (*Id.* ¶ 32.)

---

[1] Because this is a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true.  *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 188 (2d Cir. 2012).  The Court, therefore, recites the relevant facts that are sufficiently pled in the complaint, but does not rely on any conclusory statements from the complaint.  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (court "need not credit conclusory statements unsupported by assertions of facts[,] or legal conclusions . . . presented as factual allegations" (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986))).

Approximately one week after the December 12, 2014 meeting, Maresca returned to Rockaway's place of business to install credit card processing equipment. (*Id.* ¶ 50.) After the equipment was installed, Plaintiffs began establishing accounts with retail customers, including the Jabar Star Deli ("Jabar"). (*Id.* ¶¶ 53–55.) From December 2014 until September 2016, Plaintiffs conducted business using the credit card processing equipment provided by Defendants without incident. (*Id.* ¶ 57.)

Between September 13, 2016 and September 19, 2016, however, a frequent, large-volume purchaser named Fareek Ali made a series of seven in-person credit card purchases on behalf of Jabar, totaling $47,000 ("the Ali transactions"). (*Id.* ¶¶ 57–58.) The Ali transactions were approved by the credit card processing system provided by Defendants. (*Id*. ¶ 59–61.) Despite the apparent approval of the Ali transactions through Defendants' system, Ali's bank later denied payment on the transactions, claiming that they were either erroneous or fraudulent. (*Id.* ¶ 65.) Tapias then contacted Defendant First Data about the denial of payment. (*Id.* ¶¶ 62–67.) First Data advised him that Rockaway would not receive payment for the Jabar transactions; rather, First Data was going to charge Rockaway $47,000 for the fraudulent transactions. (*Id.* ¶ 68.) On September 28, 2016, First Data informed Rockaway that its account would be closed and First Data would no longer provide credit card services to Rockaway. (*Id.* ¶ 69.) When Tapias attempted to dispute this termination, he was directed to contact Defendants WFMS and WFC. (*Id.* ¶¶ 70–71.)

As a consequence of terminating Rockaway's account, Defendants reported Plaintiffs to MATCH, a watchlist maintained by Mastercard and utilized by major credit card companies to identify potentially high-risk merchants. (*Id.* ¶¶ 72–74.) Plaintiffs became aware of this fact when they attempted to open up a second credit processing account with JP Morgan Chase Bank, N.A.

("Chase"). (*Id.* ¶ 72.) Chase initially allowed Rockaway to open an account, but subsequently closed it. (*Id.*) In notifying Rockaway that its new account would be closed, Chase informed Plaintiffs that Rockaway had been placed on the MATCH list for "money laundering." (*Id.* ¶¶ 72, 76.) Rockaway also applied to open a credit card processing account with Integrity Payment Systems, LLC, but was similarly denied due to the fact that it was on the MATCH list. (*Id.* ¶ 79.)

In search of an explanation for why Plaintiffs were placed on the MATCH list, Tapias contacted Defendant WFMS. (*Id.* ¶ 80.) In response, Joseph Claybaugh, a WFMS Merchant Service Specialist, informed Tapias that on December 14, 2016 Plaintiffs had been placed on the MATCH list because they had "forced through" the Ali transactions. (*Id.*) Claybaugh also informed Tapias that Ali could not be contacted and that Ali's bank was unable to confirm any information about him. (*Id.* ¶ 82.)

Following this conversation, Plaintiffs filed a complaint against Ali with law enforcement, and criminal charges were later filed. (*Id.* ¶ 86.) Ali eventually pleaded guilty to petit larceny in violation of New York Penal Law § 155.25 and executed a confession of judgment in favor of Plaintiffs in the amount of $54,105.57. (*Id.* ¶ 87.) Despite obtaining this confession of judgment, Plaintiffs have not collected any funds from Ali. (*Id.* ¶ 89.) Plaintiffs claim they are unable to obtain cost-effective credit card processing services so long as they appear on the MATCH list, and their retail profits have decreased by around $5,000 per week due to an inability to process credit card sales. (*Id.* ¶¶ 91–92.) Mastercard has advised Plaintiffs that only Defendants can initiate a removal of Plaintiffs' names from the MATCH list, but, to date, Defendants have refused to do so. (*Id.* ¶¶ 97–98.)

## II.    Procedural History

Plaintiffs filed the initial complaint in this matter in Queens County Supreme Court on December 26, 2017.  (Dkt. 1-1, Exhibit A.)  Defendants filed a notice of removal on January 26, 2018, invoking this Court's diversity jurisdiction.  (Dkt. 1, ¶ 4.)  Defendants filed their first motion to dismiss on February 2, 2018.  (Dkt. 5.)  In response, Plaintiffs sought, and were granted, leave to file an amended complaint, which was filed on June 26, 2018.  (Dkt. 17.)  Defendants filed the instant motion to dismiss on August 2, 2018.  (Defendants' Motion ("Defs.' Mot."), Dkt. 18.)

In support of their motion, Defendants submitted an affidavit provided by Lewis Maresca, a sales agent for In-Store Marketing Services, Inc.  (Maresca Affidavit ("Maresca Aff."), Dkt. 20-1.)  Attached to the Maresca affidavit are two form contracts, both titled "Merchant Processing Application and Agreement."  (Dkts. 20-3, 20-4.)  The first form contract ("the Partial Form") is incomplete and lacks a signature page, but is partially filled out and indicates "Rockaway Beverage Inc." as the subject client.  (Partial Form, Dkt. 20-3, at 1.)  Maresca's affidavit indicates that he has been unable to locate a complete copy of the Partial Form.  (Maresca Aff., ¶ 5.)  The second form contract ("the Standard Form") is a blank copy of the same contract as the Partial Form, but with all pages attached, including the signature page.  (Standard Form, Dkt. 20-4.)  Tapias maintains that the Partial Form was not filled out or executed by him (First Tapias Declaration ("First Tapias Decl."), Dkt. 21-3, ¶ 2), and he states that he has never seen the Standard Form prior to this litigation (Second Tapias Declaration ("Second Tapias Decl."), Dkt. 25-1, ¶ 8).  (*See also* SAC, ¶¶ 35–36 (stating that the Partial Form is not the Written Agreement referred to in the SAC).)

The Court held oral argument on Defendants' motion to dismiss on September 20, 2018. Based on the discussion at oral argument, the Court granted Plaintiffs' leave to file a second amended complaint in order to add a claim for fraud and excise any futile claims.  (Sept. 20, 2018

Minute Entry.) Plaintiffs' Second Amended Complaint was filed on October 22, 2018 (SAC, Dkt. 29), and Defendants supplemented their motion to dismiss on November 19, 2018 (Defendants' Supplemental Brief ("Defs.' Supp."), Dkt. 31.) Defendants' motion to dismiss was fully briefed on December 24, 2018. (Dkt. 33.)

## STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted); *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).

At the pleadings stage, the Court must limit its inquiry to the facts alleged in the complaint, the documents attached to the complaint or incorporated therein by reference, and "documents that, while not explicitly incorporated into the complaint, are 'integral' to plaintiff's claims and were relied upon in drafting the complaint." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 371, 404 (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 44 (2d Cir.1991)). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *Building Indus. Elec. Contractors Ass'n*, 678 F.3d at 188, but "need not credit conclusory statements unsupported by assertions of facts[,] or

legal conclusions . . . presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 404 (citing *Papasan v. Allain,* 478 U.S. 265, 286 (1986)). Additionally, a court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir.1995)).

## DISCUSSION

Plaintiffs' Second Amended Complaint ("SAC") asserts 13 counts seeking various forms of relief for breach of contract, fraud, and negligence. (SAC, ¶¶ 102–216.) Defendants jointly seek to dismiss the SAC in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkts. 18, 20, 23, 31.) For analytic clarity, the Court addresses Plaintiffs' claims according to their underlying theory of liability.

## I.  Plaintiffs' Breach of Contract Claims

Counts 1, 2, 6, and 11 of the SAC seek damages against Defendants for breaches of the Implied Agreement. Count 1 alleges that Defendants breached the Implied Agreement by authorizing the Ali transactions and failing to inform Plaintiffs that the Ali transactions were fraudulent. Count 2 alleges that Defendants breached the Implied Agreement by ceasing to provide credit card processing services following the Ali transactions based on meritless findings that Rockaway had engaged in fraud or money laundering. Count 6 alleges that Defendants breached the Implied Agreement by failing to provide Plaintiffs with training on how to detect and respond to fraudulent credit card transactions. Count 11 alleges that Defendants intentionally breached the Implied Agreement.

"To state a claim for breach of contract under New York law, a plaintiff must allege: (1) the existence of a contract; (2) that the plaintiff has performed his or her obligations under the

contract; (3) that the defendant failed to perform his or her obligations thereunder; and (4) that plaintiff was thereby damaged."[2] *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 151 (S.D.N.Y. 2007). For the reasons discussed below, the Court finds that, though the precise identity, nature, and terms of the underlying contract are in dispute, Plaintiffs have sufficiently alleged claims for breach of contract that should proceed to discovery.

### A. Existence of a Contract

For a contract to exist, it need not be memorialized in a written form. Even if an express written contract does not exist, a contract may be "implied in fact" as a result of "an inference from the facts and circumstances of the case." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 506 (2d Cir. 2009) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414, 420 (N.Y. 1975)). "[A]lthough not formally stated in words," an implied-in-fact contract "is derived from the presumed intention of the parties as indicated by their conduct." *Id.* at 506–07. However, "[a] contract cannot be implied in fact where there is an express contract covering the subject matter involved." *Saeed v. Kreutz*, 606 F. App'x 595, 597 (2d Cir. 2015) (summary order) (quoting *Julien J. Studley, Inc. v. N.Y. News, Inc.*, 512 N.E.2d 300, 301 (N.Y. 1987)).

"The terms of an implied-in-fact contract turn on the conduct of the parties." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (citing *Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234, 236 (3d Dep't 1992)). In addition to the terms evinced by the parties' conduct, New York law imposes an implied covenant of good faith and fair dealing in all contracts. *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d

---

[2] New York law governs Plaintiffs' breach of contract claims because the alleged implied-in-fact or written contracts were entered into in New York, and a federal court deciding an action based on diversity jurisdiction applies the applicable state law. *U.S. Engine Prod., Inc. v. ISO Grp., Inc.*, No. 12-CV-4471 (JS) (GRB), 2013 WL 4500785, at *4 (E.D.N.Y. Aug. 20, 2013).

Cir. 2006) (citing *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *511 West 232nd Owners Corp.*, 773 N.E.2d at 500 (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995)).

Here, Plaintiffs claim that the parties operated under an implied-in-fact contract—the Implied Agreement—pursuant to which Defendants provided credit card processing services to Rockaway in exchange for Rockaway's payment of certain fees. (SAC, ¶ 26.) The SAC alleges that the parties operated under the Implied Agreement without dispute for nearly two years. (SAC, ¶¶ 50–57.) Though Defendants dispute whether an implicit or express contract governed their relationship with Rockaway, they do not dispute that they provided credit card processing services to Rockaway during the nearly two-year period. (Defs.' Mot., at 1.) This alleged course of conduct, accepted as true, suffices to establish the existence of an implied-in-fact contract. *See Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977) (holding that courts should look to "objective manifestations of the intent of the parties as gathered by their expressed words and deeds" to determine the existence of a binding contract).

Defendants, however, appear to argue that the existence of the Standard Form and the Partial Form vitiate Plaintiffs' claim that there existed an implied-in-fact contract between the parties, and that those forms, though incomplete and unsigned, constitute the only contract that existed between the parties.[3] Plaintiffs dispute this conclusion and the parties' factual allegations,

---

[3] Defendants' supplemental briefing in response to the SAC largely ignores Plaintiffs' breach of contract claims based on the Implied Agreement (*see generally* Defs.' Supp., Dkt. 31), which leaves the Court with Defendants' arguments primarily addressing earlier versions of the complaint. (*See* Dkts. 18, 20, 23.) The original complaint and the first amended complaint alleged

to the extent the Court has considered them, are inconclusive. Though the Partial Form suggests that it was filled out in connection with an agreement for Defendants to provide credit card processing services to Rockaway (Partial Form, Dkt. 20-3), the parties dispute whether Tapias ever saw this form contract, signed it, or agreed to its terms (*compare* Defs.' Br., at 2, *with* SAC, ¶ 36). At the same, while Tapias acknowledges signing a document at the December 12, 2014 meeting, he cannot specify the subject matter of the document he signed (Second Tapias Decl., ¶ 5), and Defendants are similarly unable to produce the Written Agreement bearing Tapias's signature.

Thus, the issue of what contract existed between the parties relating to the provision of credit card processing services to Plaintiffs turns on issues of fact that cannot be resolved at the pleadings stage. If the Partial Form is, indeed, the document that Tapias signed on December 12, 2014, Plaintiffs' claims under the Implied Agreement cannot proceed. *See Saeed*, 606 F. App'x at 597 ("A contract cannot be implied in fact where there is an express contract covering the subject matter involved."). If the Written Agreement was, as alleged in the SAC, simply an agreement providing for Plaintiffs' use of credit card processing *equipment*, *i.e.*, a lease, then there is the possibility that an implied-in-fact contract can be inferred from the parties' conduct. *See*

_____

the breach of a *written* contract (*see* Dkt. 1-1, ¶ 8; Dkt. 17, ¶ 27), which Defendants have argued is the Partial Form produced by Maresca (*see* Defendants' Letter Brief ("Defs.' Br."), Dkt. 20, at 2). Despite maintaining throughout these proceedings that there was a written agreement, *i.e.*, the Written Agreement (First Tapias Decl., ¶ 2; Second Tapias Decl., ¶¶ 3–4), Plaintiffs now allege in the SAC that the Written Agreement related only to the use of credit card *equipment* and that Defendants' provision of credit card processing *services* was governed by an implied-in-fact agreement, *i.e.*, the Implied Agreement. (*Compare* SAC, ¶ 26, *with id.*, ¶ 29.) Defendants, however, advance no new arguments regarding the Implied Agreement, but instead refer the Court back to "the reasons set forth in the previous briefing on Defendants' Motion and at the hearing" (Defs.' Supp., at 2), namely, in sum and substance, that the Partial and Standard Forms produced by Maresca constitute the governing written contract (Defs.' Br., at 2; Transcript, Dkt. 27, at 71:18–72:13). Accordingly, the Court construes Defendants' supplemental letter brief as challenging Plaintiffs' claims for breach of an implied-in-fact contract based on the alleged existence of a written contract governing the same subject matter. *See Saeed*, 606 F. App'x at 597.

*Leibowitz*, 584 F.3d at 506 (implied in fact contract may be inferred from the facts and circumstances of the case). That these issues cannot be resolved at the pleadings stage precludes dismissal of Plaintiffs' breach of contract claims. *See Nwachukwu v. Chem. Bank*, No. 96-CV-5118 (KMW), 1997 WL 441941, at *8 (S.D.N.Y. Aug. 6, 1997) (observing that, under New York law, a "plaintiff's assertion of a claim based upon an implied contract" may only be dismissed if "[t]he existence of an express contract" has been definitively established).

Thus, the Court finds that Plaintiffs have sufficiently alleged the existence of a contract as of December 12, 2014 between the parties regarding the provision of credit card processing services.

### B. Plaintiffs' Performance of Their Contract Obligations and Defendants' Breach

Plaintiffs further allege that they performed their obligations under the Implied Agreement (SAC, ¶¶ 107, 116), but that Defendants breached the Implied Agreement in three ways: (1) by authorizing the fraudulent Ali transactions and failing to alert Plaintiffs to their fraudulent nature; (2) by failing to provide Plaintiffs with training to detect fraudulent activity; and (3) by breaching the implied covenant of good faith and fair dealing through the termination of Rockaway's account and placement of Plaintiffs on the MATCH list. (SAC, ¶¶ 102–120, 144–152.) Whether Defendants' actions actually constitute a breach of contract must be determined by reference to the parties' conduct throughout the course of their contractual relationship. *Beth Israel Med. Ctr.*, 448 F.3d at 582 (stating that the parties' course of conduct defines the terms of an implied-in-fact contract). At the pleadings stage, however, these allegations are sufficient to establish the third element of a breach of contract claim.

### C. Injury

Finally, Plaintiffs claim that, as a result of Defendants' alleged breaches of the Implied Agreement, they have suffered injury by (1) becoming victims of the fraudulent Ali transactions

and (2) being placed on the MATCH list, which has rendered cost-effective credit card processing services inaccessible to Plaintiffs. (SAC, ¶¶ 108, 117–119.)

*     *     *

In sum, the Court finds that the allegations in the SAC suffice to state Plaintiffs' claims for a breach of contract as to the Implied Agreement. Counts 1, 2, 6, and 11 will proceed to discovery.

## II.     Plaintiffs' Claim for Unjust Enrichment

In Count 7, Plaintiffs allege that Defendants were unjustly enriched by obtaining fees from Plaintiff Rockaway for the performance of credit card processing services without good faith and in an unreasonable manner. (SAC, Dkt. 29, ¶¶ 153–159.)

Unjust enrichment is, in essence, a quasi-contract claim for relief where "one party has received money or a benefit at the expense of another." *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381 (4th Dep't 1999). New York law allows recovery in such circumstances "[based] upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *State v. Barclays Bank of N.Y., N.A.*, 563 N.E.2d 11, 15 (N.Y. 1990). This principle, however, will only apply "in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005). Thus, a plaintiff may not simultaneously sue for a breach of contract and allege unjust enrichment. *See Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (finding dismissal of unjust enrichment claims appropriate when the parties did not dispute the existence of a contract). If a contract governs the relationship between the parties in a dispute, any unjust enrichment claims must be dismissed. *See Beth Israel Med. Ctr.*, 448 F.3d at 586 (affirming dismissal of unjust enrichment claims after determining that a contractual relationship existed between the parties).

Here, Plaintiffs have specifically claimed that the parties' relationship was governed by one or more contracts, *e.g.*, the Implied Agreement and the Written Agreement. (SAC, ¶¶ 26–33.)

Though the parties dispute the content of the Written Agreement and its relationship to the alleged Implied Agreement, this suit arises solely from actions taken by the parties based on one agreement or the other. Having chosen to sue Defendants for breach of an implied-in-fact contract, Plaintiffs are precluded from seeking recovery on an unjust enrichment theory. *See Jeda Capital-56, LLC v. Lowe's Home Ctrs., Inc.*, No. 5:12-CV-419 (LEK/DEP), 2013 WL 5464647, at *8 (N.D.N.Y. Sept. 30, 2013) (citing *Clark-Fitzpatrick*, 516 N.E.2d at 193). Thus, Plaintiffs' claim for unjust enrichment is dismissed.

### III. Plaintiffs' Negligence Claims

Counts 3, 4, 12, and 13 allege that Defendants were negligent and grossly negligent in approving the Ali transactions, failing to inform Plaintiffs that the Ali transactions were fraudulent, and adding Plaintiffs' names to the MATCH list. (SAC, ¶¶ 121–135, 200–216.) The Court finds that Plaintiffs may only proceed on their negligence and gross negligence claims relating to Defendants' reporting of Plaintiffs to the MATCH list.

"Under New York law, the elements of negligence are: (a) the existence of a legal duty to the plaintiff; (b) a breach of that duty; (c) proximate causation; and (d) damages." *Jordan v. Tucker, Albin, & Assocs., Inc.*, No. 13-CV-6863 (JMA) (SIL), 2017 WL 2223918, at *12 (E.D.N.Y. May 19, 2017) (citing *Luina v. Katharine Gibbs Sch. N.Y., Inc.*, 830 N.Y.S.3d 263, 264 (2d Dep't 2007)). "Gross negligence is defined as 'conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.'" *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 204 F. Supp. 2d 639, 644 (S.D.N.Y. 2002) (quoting *Am. Telephone & Telegraph Co. v. The City of New York*, 83 F.3d 549, 556 (2d Cir. 1996)).

"It is well established that where 'the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative.'" *Fixed Income*

*Shares: £Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (quoting *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012)); *see also In re September 11 Litig.*, 640 F. Supp. 2d 323, 338 (S.D.N.Y. 2009) ("A tort claim will not lie as a means to enforce a contractual bargain." (citing *N.Y. Univ. v. Cont'l Ins. Co.*, 662 N.E.2d 763, 767 (N.Y. 1995))).  While tort claims may be maintained if the law imposes a duty that is distinct from a defendant's contractual obligations, a plaintiff may not "transform a simple breach of contract into a tort claim" merely by framing the claim in the language of tort law.  *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 460 (N.Y. 2018) (quoting *Clark–Fitzpatrick*, 516 N.E.2d at 194).  Thus, if a plaintiff's injury stems solely from a failure to perform on the contract, a tort claim cannot proceed.  *See Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992).

In this case, Plaintiffs largely fail to distinguish their negligence claims from their breach of contract claims, as the former claims predominantly concern Defendants' failure to detect the fraudulent Ali transactions and termination of the Implicit Agreement.  Though cloaked in the language of negligence, Plaintiffs' allegations of tortious conduct relating to the Ali transactions merely restate Defendants' contractual obligations under the Implied Agreement.  Indeed, the factual allegations set forth in Plaintiffs' contract and negligence claims relating to the Ali transactions are virtually identical.  (*Compare* SAC, ¶¶ 104–106 (stating that Defendants' authorization of the Ali transactions and failure to alert Plaintiffs to their fraudulent nature breached Defendants' obligations under the Implied Agreement), *with id.* ¶¶ 122–124 (stating that Defendants' breached a duty of care owed to Plaintiff Rockaway by initially indicating that the Ali transactions were approved and failing to alert Plaintiff Rockaway that the transactions were fraudulent).)  The gravamen of these allegations is that Defendants failed to comply with their

contractual obligations and that Plaintiffs were harmed by those failures. Thus, Plaintiffs' negligence claims relating to the Ali transactions are incompatible with an action to recover for a breach of contract and must be dismissed.

However, Plaintiffs' negligence claims relating to Defendants' referral of Plaintiffs to the MATCH list present a different situation. Plaintiffs allege that Defendants "further breached their duty of care to Plaintiffs by . . . placing Plaintiffs on the MATCH list following their careless investigation of the matter." (SAC, ¶ 132.) The SAC states that Defendants took this action intentionally in order to cast blame on Plaintiffs for the fraudulent Ali transactions and to protect the reputation of their credit card processing services. (*Id.* ¶¶ 180–81.) Plaintiffs also assert that they have been damaged through their inability to obtain affordable credit card processing services. (*Id.* ¶ 101.)

With respect to the placement of Plaintiffs' names on the MATCH list, the Court finds that Plaintiffs have sufficiently alleged negligence and gross negligence and that these claims are not identical to and consequently foreclosed by Plaintiffs' breach of contract claims. Given the uncertainty regarding the identity and terms of the contract between the parties, the Court cannot find, at this stage, that the contract addressed Defendants' rights and/or obligations with respect to reporting suspected fraudulent activity by one of Defendants' customers to the MATCH list, and thus whether Plaintiffs' negligence claims based on the MATCH list referral implicate a duty that is distinct from Defendants' contractual obligations. *See Dormitory Auth.*, 94 N.E.3d at 460 (negligence claim must be based on a duty distinct from defendant's contractual obligations). If Plaintiffs can show that the Implied Agreement governed the parties' contractual relationship, they may well be able to show that that agreement did not allow or provide for Defendants to report Plaintiffs to the MATCH list based on suspected fraud, and that, by doing so—especially where

the fraud was committed by one of Plaintiffs' customers whose credit card transaction Defendants were responsible for screening—Defendants violated an independent duty of care owed to Plaintiffs.

In sum, Counts 4 and 13 of the SAC will proceed to discovery, but only on Plaintiffs' negligence and gross negligence claims relating to the MATCH list placement. Counts 3 and 12, which do not relate to the MATCH list placement, are dismissed.

## IV.   Plaintiffs' Fraud Claims

Following the September 20, 2018 oral argument, Plaintiffs filed their SAC to add claims for fraudulent inducement (Count 9) and fraud (Count 10). (SAC, ¶¶ 165–186.) Defendants subsequently supplemented their motion to dismiss, seeking to dismiss these new claims for failure to state a claim. (Defs.' Supp., Dkt. 31.)

### A.  Fraudulent Inducement

In Count 9, Plaintiffs allege that Maresca, acting as Defendants' agent, falsely told Plaintiffs that Defendants' credit card processing system was secure and capable of identifying fraudulent transactions prior to approval and that Defendants had a policy of investigating fraudulent transactions thoroughly before assigning blame for them. (*Id*. ¶¶ 166–167.) Plaintiffs assert that these misrepresentations were made for the purpose of inducing Rockaway to enter the Implied Agreement and that Defendants are therefore liable for fraudulent inducement. (*Id*. ¶¶ 165–175.)

Under New York law, a plaintiff must allege four elements to state a claim for fraudulent inducement: (1) a material misrepresentation of a presently existing or past fact; (2) an intent to deceive; (3) reasonable reliance on the misrepresentation by the plaintiff; and (4) resulting damages. *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012). Additionally, the plaintiff must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading

standards, which require a plaintiff to "'specify the time, place, speaker, and content of the alleged misrepresentations, . . . how the misrepresentations were fraudulent' and 'those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth.'" *Janese v. Fay*, 692 F.3d 221, 228 (2d Cir. 2012) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001)).

Plaintiffs adequately allege each element of a claim for fraudulent inducement. The first element is satisfied by the SAC's allegations that, at the December 12, 2014 meeting with Plaintiffs, Maresca represented that "the credit card services provided by [Defendants] were safe and secure, that the credit card processing system was capable of identifying fraudulent transactions prior to being approved[,] . . . and that [Defendants] had a policy of investigating any allegations of fraudulent transactions thoroughly . . . before drawing any conclusion about who was responsible for that transaction." (*Id.* ¶¶ 166–167.) These statements directly implicate the nature and quality of Defendants' services and business practices at the time of the negotiation— information that would have been material to any potential business partner's decision on whether to contract with Defendants. The second element—deceptive intent—is satisfied by the SAC's allegations that Defendants knew that Maresca's statements were false, but nevertheless intended that they be made in order to induce Rockaway to contract with Defendants for credit card processing services. (*Id.* ¶¶ 168–169.) The third element, reasonable reliance, is satisfied based on Plaintiffs' allegation that they relied on Maresca's representations in deciding to enter into the Implied Agreement and tailoring their retail beverage distribution business around the use and acceptance of credit cards. (*Id.* ¶ 170.) Lastly, Plaintiffs adequately allege the fourth element of injury by stating that they lost $47,000 worth of goods due to the fraudulent Ali transactions and have been unable to acquire cost-effective credit card processing services due to the placement of

their names on the MATCH list without sufficient investigation. (*Id.* ¶¶ 93, 173.) Thus, the Court finds that Plaintiffs have successfully pleaded facts to establish the elements of a fraudulent inducement claim.

Furthermore, the Court finds that Plaintiffs have satisfied Rule 9(b)'s heightened pleading requirements. Plaintiffs have "specif[ied] the time, place, speaker, and content of the alleged misrepresentations." *Janese*, 692 F.3d at 228. They state that they met with Maresca on December 12, 2014 at Rockaway's place of business at 153-25 Rockaway Boulevard in Jamaica, New York, where Maresca informed Plaintiffs that Defendants' credit card processing services could identify fraudulent transactions and that Defendants had a policy of thoroughly investigating fraudulent transactions prior to assigning blame to any party. (SAC, ¶ 25.) Plaintiffs have further specified "how the [alleged] misrepresentations were fraudulent," *Janese*, 692 F.3d at 228, by stating that the Ali transactions would not have been approved if Defendants' credit card processing system performed as Maresca described and that Plaintiffs' names would not have been placed on the MATCH list if a thorough investigation of the Ali transactions had been conducted, as Maresca had promised. (SAC, ¶¶ 59–66, 83–90.) Finally, Plaintiffs assert that Defendants' credit card processing system approved seven fraudulent transactions totaling $47,000 over the course of one week and that, prior to any meaningful inquiry, Defendants informed the MATCH list that Plaintiffs were engaged in money laundering. (*Id.* ¶¶ 58, 72–76.) These allegations raise a sufficiently "strong inference" that Defendants exhibited, at least, "a reckless disregard for the truth" of Maresca's representations to Plaintiffs. *Janese*, 692 F.3d at 228.

Additionally, the Court finds that Defendants may be held vicariously liable for statements made by Maresca in negotiating the contract between Rockaway and Defendants. Whether or not Maresca's alleged misrepresentations were within the scope of his authority to negotiate credit

card processing contracts, Defendants may be liable if they later ratified an agent's fraudulent statements. *See Dover Ltd. v. A.B. Watley, Inc.*, 423 F. Supp. 2d 303, 318 (S.D.N.Y. 2006) ("Even in the absence of actual or apparent authority, a person may still be liable as a principal if he affirms or ratifies 'an act done by one who purports to be acting for the ratifier.'" (quoting *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 912 (S.D.N.Y. 1991))). An agent's statements are ratified if the principal "retains the benefits derived from them." *Adler v. Helman*, 564 N.Y.S.2d 828, 830 (3d Dep't 1991) (citation omitted); *see also Dover*, 423 F. Supp. 2d at 318 ("[R]atification is a 'form of retroactive activity' that occurs when the principal . . . 'accepts the benefits of [the] agent's action' already made on his behalf." (quoting *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 850 F. Supp. 1199, 1213 (S.D.N.Y.1994))). The SAC alleges that Maresca told Plaintiffs that he was Defendants' agent authorized to contract for credit card processing services (SAC, ¶ 20), and Maresca himself confirms that he sold such services on behalf of Defendant First Data Merchant Services and Defendant WFB (Maresca Aff., ¶ 2). Though discovery may confirm that Maresca acted solely on behalf of those two Defendants, the Court finds it inappropriate to resolve this discrepancy on a motion to dismiss. Thus, Plaintiffs have sufficiently alleged that Maresca acted as Defendants' agent in contracting with Rockaway. Furthermore, based on the allegations that Defendants ultimately provided credit card processing services to Rockaway in exchange for fee payments, Defendants may be found to have ratified any agreement negotiated by Maresca and therefore would be liable for any false statements he made to induce Plaintiffs to enter into the agreement. *See Banque Arabe*, 850 F. Supp. at 1213.

Accordingly, the Court denies Defendants' motion to dismiss Count 9 of the SAC.

**B. Fraud**

For their fraud claim in Count 10, Plaintiffs contend that Defendants falsely reported to the MATCH list that Plaintiffs had engaged in fraudulent activity and money laundering. (*Id.* ¶¶ 176–

186.)  Under New York law, a plaintiff must allege the following elements to state a claim for fraud: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff.  *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001) (citing *Lama Holding Co. v. Smith Barney, Inc*., 668 N.E.2d 1370, 1373 (N.Y. 1996)).

Count 10 of the complaint fails to allege facts that satisfy the fourth and fifth elements of a fraud claim, namely, that *Plaintiffs* reasonably relied on Defendants' misrepresentations and suffered injury from that reliance.  *See id.*  Instead, Plaintiffs allege that they suffered (and continue to suffer) injury due to the *MATCH list*'s reliance on Defendants' misrepresentations.  (*See* SAC, ¶ 182 ("[T]he MATCH list was justified in relying on [Defendants'] material misrepresentations").)  However, Plaintiffs' theory of fraud has been expressly rejected by the New York Court of Appeals.

In *Pasternack v. Laboratory Corporation of America Holdings*, 807 F.3d 14 (2d Cir. 2015), the Second Circuit certified a question to the New York Court of Appeals, asking "whether a plaintiff may state a fraud claim, despite the absence of reliance by the plaintiff on the alleged misrepresentations, where a non-plaintiff third party is alleged to have relied on the misrepresentations in a manner that caused injury to the plaintiff."  59 N.E.3d 485, 492 (N.Y. 2016).  The Court of Appeals answered no, "declin[ing] to extend the reliance element of fraud to include a claim based on the reliance of a third party, rather than the plaintiff."  *Id*. at 493.  Where, as here, the relevant misrepresentations were not communicated to, or relied on, by the plaintiff, *Pasternack* forecloses claims for fraud.  *See Amusement Indus. Inc. v. Stern*, 721 F. App'x 9, 12

(2d Cir. 2018) (summary order) ("*Pasternack* holds that the reliance element of a fraud claim cannot be proved by reference to a defendant's misrepresentation to a third party . . . .").

Accordingly, Count 10 of the SAC is dismissed.

## V.    Plaintiffs' Remaining Claims

Plaintiffs' remaining claims for relief, Counts 5 and 8, are demands for injunctive relief and punitive damages, rather than independent causes of action.  Because independent causes of action continue to exist in this case, however, the Court declines to dismiss them at this point in the case.  *Cf. Porat v. Lincoln Towers Cmty. Ass'n*., No. 04-CV-3199 (LAP), 2005 WL 646093, at *7 (S.D.N.Y. Mar. 21, 2005) (dismissing a demand for relief styled as a cause of action because no independent causes of action could support federal jurisdiction).

### CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss the Second Amended Complaint is granted in part and denied in part.  The following claims will proceed:

- Count 1 – Breach of the Implied Agreement by approving the Ali transactions and failing to alert Plaintiffs to their fraudulent nature
- Count 2 – Breach of the Implied Agreement by terminating credit card processing services for fraud and reporting Plaintiffs to the MATCH list
- Count 4 – Negligence based on Defendants' referral of Plaintiffs to the MATCH list
- Count 6 – Breach of the Implied Agreement by failing to provide training on how to detect and respond to fraudulent credit card transactions
- Count 9 – Fraudulent Inducement
- Count 11 – Intentional breach of the Implied Agreement
- Count 13 – Gross negligence based on Defendants' referral of Plaintiffs to the MATCH list

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen

United States District Judge

Dated: March 29, 2019
        Brooklyn, New York